## THE TRANSFER NO. 9.

### THE WILLIAM J. SEWELL.

(Circuit Court of Appeals, Second Circuit. February 27, 1901.)

### No. 76.

COLLISION—STEAM VESSELS MEETING IN CHANNEL—SIMULTANEOUS PASSING OF TWO VESSELS.

A transfer tug passing down East river with a car float on either side *held* in fault for a collision with a schooner coming up in tow, which occurred as she was rounding Horn's Hook between the shore and the center of the channel, on the ground that, being in a position where careful navigation was required, owing to the number of vessels passing and the flood tide, after having agreed to allow the tug and schooner to pass ahead of her, she also assented to the signal of another tug coming up nearby, abreast of the schooner, with a tow on each side, to permit the latter to pass across her stern, and thereby placed herself in a situation where she was unable to avoid collision with one of the two passing vessels.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeals from a decree of the district court, Southern district of New York, holding the steam tug Transfer No. 9 solely in fault for a collision between a car float lashed to her port side and the schooner Viking in tow of the William J. Sewell. The facts appear in the opinion.

Henry W. Taft, for the Transfer No. 9.
Frank D. Sturges, for libelant.
Le Roy S. Gove, for appellee.

Before WALLACE and LACOMBE, Circuit Judges.

LACOMBE, Circuit Judge. The accident happened about 10 a. m., August 24, 1899. The Sewell, with the Viking in tow on a hawser of about 40 fathoms, was going up the East river, on a flood tide, near the middle of the channel on the west side of Blackwell's Island, bound through Hell Gate. When she reached Eighty-Second street the Sewell sounded the long, bend-warning signal for Horn's Hook, which is at the foot of Eighty-Ninth street. No answer was received to it. When about off Eighty-Fourth street the steam tug R. S. Carter, with a schooner in tow on a hawser of 25 fathoms, was seen south of Mill Rock and in the Gate going towards Astoria, heading for the east channel (i. e. the channel to the east of Blackwell's Island). The Carter blew two whistles to the Sewell, to which the latter replied with two. When about abreast of Eighty-Sixth street, still in the middle of the channel, the captain of the Sewell noticed the bows of two car floats coming out of Horn's Hook, lashed to Transfer No. 9. He at once blew her one whistle, to which she replied with one. While running thus through the west channel, the Sewell had overtaken another flotilla, consisting of the steam tug Harlem River No. 2 with a coal boat in tow on

each side, which was nearer the New York shore (within 150 feet of it) bound for Harlem river. When about abreast of Eighty-Second street the captain of Harlem River No. 2 heard a long whistle from above the Hook, and himself sounded a long one as a warning to boats above the Hook that he was bound up. When No. 2 reached Eighty-Sixth street, the pilot perceived Transfer No. 9, to which he blew two whistles, receiving two whistles in reply. Transfer No. 9 had come down the middle of the Harlem river. When off Ninety-Second street she encountered Transfer No. 11, a sister tug belonging to the same claimant, bound up, which passed between No. 9 and Mill Rock. No. 9 stopped her engines to allow No. 11 to pass, her headway taking her nearer to the New York shore. She then starboarded her wheel and went ahead under one bell to come out to the point of Horn's Hook, intending to cross from that point to the east channel. She blew the long, bend-warning signal, but heard neither of those blown by the Sewell and No. 2, nor was her own heard by the Sewell. This sometimes happens in that locality, when the downward bound boat is well in towards the New York shore. No. 9 went out beyond Horn's Hook under one bell, and as soon as it was possible to see down the west channel her lookout on the bow of the car float reported to her captain that a tugboat with a schooner was coming up the river. The captain immediately stopped No. 9's engines, and the whistles with the Sewell were exchanged. Shortly after the two-blast signal of Harlem River No. 2 was heard and responded to, whereupon No. 2 hauled in towards the New York shore, and No. 9 went ahead under one bell two or three turns to get headway enough to allow room for No. 2 to pass between her and the Hook. In doing so No. 9 brought her stern out into the river, as she admits, about 200 feet beyond the Hook. The Sewell proceeded on her course, and passed ahead of No. 9, clearing her by a space which her captain estimates at 350 feet, and the captain of No. 9 at 75 feet. Being apprehensive that the Viking, under the action of the tide, would swing into him, the captain of No. 9 began to back, and continued doing so until No. 2 blew alarm whistles to prevent No. 9 backing into her starboard boat. The collision occurred just as No. 9 stopped backing, the tide swinging the bows of her port float against the Viking's port quarter. The location of this collision is one where it is difficult to navigate. ' To the south there are the two channels on either side of Blackwell's Island, to the north the Harlem River and the Gate on either side of Mill Rock. The obscuration of vision caused by Horn's Hook, the uncertainty of hearing whistles across it, the presence of Flood Rock, the various eddies and swirls produced by a three-mile tide, coupled with the fact that it is frequently filled with vessels proceeding up, down, and across, require the most careful navigation on the part of all who undertake to pass through there. In such a location the initial fault which brings about a situation of peril is much more serious than it would be in waters where there is a better chance for escaping from such situation by subsequent maneuvers. When one such, fault, clearly established, is found to have precipitated the peril, the court will

give much weight to any reasonable excuse offered by one of the other vessels for not undertaking some maneuver which might have avoided the catastrophe.

From the above statement it is self-evident that, except for Harlem River No. 2, the other boats would have dealt with the situation easily and safely. Had No. 9 stayed where she was when she stopped her engines, or moved out only far enough to avoid the effect of tide and eddy, the Sewell and the Viking would have passed with a broad margin of safety. A situation of safety was turned into a situation of peril when an agreement was made which necessitated the reduction of that margin. As the proposer of that agreement, Harlem River No. 2 was primarily in fault, and, were it included in this suit, should be held liable. Its master was aware of the exact situation, he had heard the exchange of signals which called upon the Sewell to proceed across the bows of No. 9, and he should have waited where he was, stopped, or backed, until the Viking had passed No. 9, before insisting that No. 9 should move out nearer to the line of the tug and schooner. No. 2 was the privileged vessel, ordinarily entitled to pass No. 9 under its stern, and to require its co-operation to such navigation; but the Sewell was also privileged, and had already availed of its privilege to lay out a plan of navigation which it was improper for No. 2 to undertake to interfere with. But No. 2 is not here, so her faults need be no further considered. The district judge held No. 9 in fault, finding that it was "unjustifiable navigation to keep near the New York shore under Horn's Hook, obscured from view of vessels below, and where signals, though given, are often not heard, instead of coming down further out in the river, as may easily be done, where the dangers may be seen in time to avoid them." While we concur in the conclusion that it is imprudent to keep so near the New York shore, we are not prepared to hold that it can in no case be justified, and are satisfied that on this occasion it should not be charged against No. 9 as a fault. There is no reference in the opinion to the circumstances under which she found herself so near the shore. She had about reached Ninety-Second street when she received a signal of one whistle from Transfer No. 11, a railroad tug, bound up the river with a car float on each side. No. 11 came around the Hook rather close to shore, which it seems is the usual course for that sort of flotilla on a flood tide, to avoid risk of being carried up to Flood Rock. No. 11 passed between No. 9 and Mill Rock, while at the same time a tug and schooner bound down (apparently the R. S. Carter) passed between No. 11 and Mill Rock. The captain of No. 9 stopped her engines to let No. 11 pass, because the tide would sweep the latter vessel in, and he did not wish to embarrass her. She passed within 50 feet. By that time No. 9's headway had carried her pretty close inshore, in the belly of the cove and behind Horn's Hook. For these reasons we are not inclined to hold No. 9 in fault for getting into that position, nor for her subsequent navigation down to the time when Harlem River No. 2 was seen, which seems to have been prudent and cautious. We are of the opinion, however, that she was clearly in fault for

assenting to the suggestion of No. 2, and agreeing to change the situation of safety for one of peril, by undertaking, in so difficult a location, to aid one flotilla to cross her bows, and at the same time aid another one to pass under her stern. Although she was the burdened vessel, having both flotillas on her starboard hand, she was under no obligation to assent to No. 2's proposal. The agreement with the Sewell constituted a special circumstance, which entitled her to reject the proposed additional agreement by blowing alarm whistles. Her master's excuse is that he thought there was room for the schooner to pass, even if he should move out far enough to let No. 2 pass inshore of him. He miscalculated, and, since the maneuver he voluntarily undertook manifestly involved risk of collision, his vessel must be held responsible for the catastrophe which such maneuver brought about.

It is urged that the captain of the Sewell ought to have ported strongly, to have gone further to the eastward, when he heard the exchange of signals between No. 9 and No. 2, and was thus advised what they were about to undertake. We have reached the conclusion, upon all the evidence, that she did not make any substantial change of course to the eastward, although the district judge held that she "ported some." The evidence is overwhelming that the collision took place near the middle of the river. That fact, coupled with the unanimous testimony of all on the Viking, who were watching and in an excellent position for observing, is most persuasive. We find, however, in the presence of the Carter and her tow, a sufficient excuse for the Sewell's holding her course. Porting strongly might have brought about another collision. It is contended that the Sewell was in actual violation of a statutory rule (article 25 of the act of June 7, 1897) which provides that "in narrow channels every steam-vessel shall when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel." This is apparently raised here for the first time. It is not charged as a fault in any of the pleadings. But conceding even that, before the collision, the Sewell was a short distance to the westward of where article 25 required her to be, she was on the proper side of mid-channel when collision took place, and the presence and maneuvers of the Carter would have interfered with her being at that time further to the eastward had she been originally where article 25 required. Her fault of prior navigation, therefore, assuming that article 25 applied, was remote, and not contributory to the collision.

The decree of the district court is affirmed, with interest and costs to libelants against Transfer No. 9, and costs to the Sewell against the Viking.