No. 46,189

United States Fidelity and Guaranty Company, *Appellant,* v. First State Bank of Salina, *Appellee,* and L. R. Foy Construction Co., Inc.

(494 P. 2d 1149)

Opinion filed March 4, 1972.

*Larry Withers,* of Kahrs, Nelson, Fanning, Hite and Kellogg of Wichita, argued the cause, and *Roger Sherwood,* of the same firm, was with him on the brief for the appellant.

*James T. Graves,* of Clark, Mize, Graves, Linville and Miller, Chartered of Salina, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: This case represents another round in the perennial struggle for priority between the surety on the performance bond of a defaulting building contractor and a bank which has advanced money to the contractor on the faith of an assignment of the contract proceeds. The new element here is the presence of the Uniform Commercial Code (UCC), K. S. A. Ch. 84. The primary question we are called upon to decide is the effect, if any, the UCC has on the priorities which would otherwise obtain—although there is some preliminary dispute as to just what those priorities should be.

The facts were stipulated below and are not in dispute.

The L. R. Foy Construction Co., Inc., ("Foy") of Hutchinson, Kansas, was awarded a contract in January, 1967, to construct a student dormitory at Chadron State College, Chadron, Nebraska. (The parties are in agreement that Kansas law should control.) Foy's role in this litigation is that of stakeholder, a role assumed in most cases of this character by the owner.

On January 25, 1967, Foy entered into a subcontract with Mid-Continent Fireproofing and Insulating Co., Inc. ("Mid-Continent") to furnish and install insulation and wall board for a contract price of $13,451.50. The contract called for periodic partial payments on approved estimates, with 10% as the retained percentage pending completion. Mid-Continent agreed to pay for all labor and materials and hold Foy harmless from any claims arising out of its failure to comply with the terms of the contract. In the event there arose any claim for which Foy or the owner "might become liable," Foy was entitled to retain from moneys then or thereafter due Mid-Continent enough to indemnify itself. Mid-Continent was required to furnish a bond or bonds "guaranteeing performance and payment of labor and material bills."

The required bond was furnished by the appellant United States Fidelity and Guaranty Company (the "surety") on January 31, 1967. By its contract the surety bound itself to Foy on the condition that Mid-Continent faithfully perform its subcontract, which was incorporated by reference. No question is raised but that the surety's guarantee included Mid-Continent's contractual obligation to pay laborers and materialmen—i. e., that it was a "payment" bond as well as a "performance" bond.

The relevant default provision was that, if the surety should be required to remedy a default, so much as might be required to reimburse the surety for its outlays should be paid to the surety out

of the balance of the subcontract price then in the hands of Foy "at the times and in the manner as said sums would have been payable to [Mid-Continent] had there been no default under the subcontract." This provision is considered by the parties as a contractual assignment of Mid-Continent's interest in its contract with Foy to secure the surety—albeit a conditional assignment. The failure of the surety to file under the UCC the bond containing this "security agreement" is appellee's most strongly urged claim to priority in this case.

In customary fashion, Mid-Continent went contract-in-hand to the appellee, The First State Bank of Salina (the "bank") to secure a line of credit to carry out its contract. There, on February 13, 1967, it executed a security agreement, assigning to the bank all its rights under its contract with Foy, to secure any and all obligations it might then or thereafter have to the bank. The bank gave Foy timely notice of the assignment, requesting that Foy make any payments under the contract payable jointly to Mid-Continent and the bank. It is stipulated that the bank's *purpose* in agreeing to extend credit (apart from its 7% interest) was to enable Mid-Continent to pay for materials and labor needed to fulfill the contract with Foy.

Mid-Continent had had prior dealings with the bank. Almost a year before, on April 13, 1966, the bank had lent money to Mid-Continent in an unrelated transaction, and had duly filed a "financing statement" under the UCC covering Mid-Continent's "Accounts receivable for goods sold or for services rendered together with equipment used by the business." It is agreed that this financing statement was broad enough to include the "security agreement" (assignment) of February 13, 1967, covering as an "account receivable" Mid-Continent's interest in the Foy contract.

The bank, relying on its security agreement backed by the filed financing statement, commenced lending money to Mid-Continent on February 28, 1967, taking a series of notes. The trial court concluded that the bank had an "attached" security interest in Mid-Continent's contract with Foy as of that date, and that conclusion is not contested. (We note here that a creditor's security interest "attaches" under UCC 9-204 (1) when "value is given, and the debtor has rights in the collateral." As to the collateral, the proceeds of the contract, the debtor Mid-Continent acquired "rights" as and when it performed. This was certainly no *earlier* than February 28, 1967.)

In due course Mid-Continent defaulted; Foy terminated its contract with Mid-Continent and completed the work itself. After deducting its cost of completion from the balance of Mid-Continent's contract price Foy holds $3492.24 which would have been due Mid-Continent had it not defaulted. This is the prize for which the parties here are competing.

The surety was presented with and, on February 2, 1968, paid claims of materialmen who had furnished Mid-Continent with material for the project which, by our calculation, amounted to $7409.19, taking assignments of the materialmen's claims and remedies. The bank lent Mid-Continent money at various times from February 28 to June 23, 1967, and after deducting payments on account, claims a balance due it as of July 9, 1967 of $2647.40.

The surety sued Foy for the balance in Foy's hands, asserting its right of subrogation, and joined the bank as a potential claimant to the fund. Foy tendered the money in its hands into court; the bank in its answer asserted its assignment (security agreement) as a lien with priority over the claim of the surety.

The issues thus joined together with the facts, stipulated in accord with the foregoing recitation, were submitted to the trial court for a decision as a matter of law. In a memorandum of September 24, 1969, it recited:

"This matter is before the Court on a stipulation of facts between the plaintiff, United States Fidelity & Guaranty Company, and the defendant, First State Bank of Salina. The sole issue is whether or not the defendant bank has a prior interest to the funds held by defendant Foy by virtue of its security agreement of February 13, 1967, and financing statement of April 13, 1966, or whether the plaintiff has a prior lien on said funds by virtue of its rights of subrogation to the rights of Mid-Continent Fireproofing and the creditors whose materials were used on the job and paid for by the plaintiff.

"The matter has been ably briefed by both parties to the dispute.

"The court finds as follows:

"1. The financing statement filed with the Secretary of State by the defendant bank is sufficient to include the funds earned by contracts of Mid-Continent and constitutes notice that a security agreement may exist on the funds now in the hands of defendant Foy.

"2. From February 28, 1967, the defendant bank had an attached security interest in the contract rights of Mid-Continent with defendant Foy as amounts became due by virtue of performance by Mid-Continent.

"3. Materialmen are subject to the provisions of the Uniform Commercial Code.

"4. The surety bond of the plaintiff constituted an attached security interest under the Code at the time it paid bills of materialmen which was not perfected by filing of a financing statement.

"5. The materialmen who were paid by plaintiff were general creditors who could not defeat the attached security agreement of the bank.

"The Court concludes that the claim of defendant First State Bank of Salina is first and prior over the claim of plaintiff United States Fidelity & Guaranty Company."

Nevertheless, the trial court on June 3, 1970, entered a "Pre-Trial Conference Order" in which it recited, *inter alia:*

"4. The remaining questions of law to be decided are as follows:

"A. Whether the plaintiff is subrogated to the rights of the creditors of Mid-Continent Fire Proofing and Insulation Company, Inc., whose materials were used and consumed in the construction of the job at Chadron State College and whose materials were paid for by the plaintiff pursuant to its surety bond.

"B. Whether the plaintiff is subrogated to the rights of L. R. Foy Construction Co., Inc.

"C. Whether the financing statement filed by defendant, First State Bank of Salina, was sufficient under the provisions of the Uniform Commercial Code.

"D. Whether the plaintiff was required to file under the provisions of the Uniform Commercial Code.

"E. Whether the rights of the plaintiff or the rights of the defendant, First State Bank of Salina, have priority with respect to the amount owed by L. R. Foy Construction Co., Inc., on the contract on Chadron State College."

This order thus reopened some of the issues apparently decided by the September 24 memorandum, and interjected at least one new issue, *i. e.,* the surety's right to be subrogated to the position of Foy, as set out in subparagraph B. All issues were resolved in a journal entry of the same date in which the September 24 memorandum was incorporated by reference, and in which the court found generally that the bank had a first and prior right to the amount held by Foy for the account of Mid-Continent.

From this determination the surety has appealed, claiming error in several particulars. In essence, it urges that the trial court misconceived a surety's right of legal or equitable subrogation, and misapplied the UCC both to the surety and to the various rights derived and asserted by it as a result of such subrogation.

Our first effort, then, is to determine the status of surety *vis-a-vis* bank, without regard to the UCC. Perhaps the leading authorities in this area are a series of cases decided by the United States Supreme Court involving government building projects, beginning with *Prairie State Bank v. United States,* 164 U. S. 227, 41 L. Ed. 412, 17 S. Ct. 142 (1896) and running through *Pearlman v. Reliance Ins. Co.,* 371 U. S. 132, 9 L. Ed. 2d 190, 83 S. Ct. 232 (1962). This judicial saga was recounted in the latter case (in which the surety on a payment bond was claiming priority over the contractor's

trustee in bankruptcy to the retained percentage in the government's hands). The Court said (371 U. S., at 137-8):

"In the Prairie Bank Case a surety who had been compelled to complete a government contract upon the contractor's default in performance claimed that he was entitled to be reimbursed for his expenditure out of a fund that arose from the Government's retention of 10% of the estimated value of the work done under the terms of the contract between the original contractor and the Government. That contract contained almost the same provisions for retention of the fund as the contract presently before us. The Prairie Bank, contesting the surety's claim, asserted that it had a superior equitable lien arising from moneys advanced by the bank to the contractor before the surety began to complete the work. The Court, in a well-reasoned opinion by Mr. Justice White, held that this fund materially tended to protect the surety, that its creation raised an equity in the surety's favor, that the United States was entitled to protect itself out of the fund, and that the surety, by asserting the right of subrogation, could protect itself by resort to the same securities and same remedies which had been available to the United States for its protection against the contractor. The Court then went on to quote with obvious approval this statement from a state case:

" 'The law upon this subject seems to be, the reserved per cent to be with-held until the completion of the work to be done is as much for the indemnity of him who may be a guarantor of the performance of the contract as for him for whom it is to be performed. And there is great justness in the rule adopted. Equitably, therefore, the sureties in such cases are entitled to have the sum agreed upon held as a fund out of which they may be indemnified, and if the principal releases it without their consent it discharges them from their under-taking.' 164 U. S., at 239, quoting from Finney v. Condon, 86 Ill. 78, 81 (1877).

"The Prairie Bank Case thus followed an already established doctrine that a surety who completes a contract has an 'equitable right' to indemnification out of a retained fund such as the one claimed by the surety in the present case. The only difference in the two cases is that here the surety incurred his losses by paying debts for the contractor rather than by finishing the contract."

As to the distinguishing feature noted in the last sentence quoted, the Court went on to observe that in *Henningsen v. U. S. Fidelity & Guaranty Co.*, 208 U. S. 404, 52 L. Ed. 547, 28 S. Ct. 389, the distinction between a surety who *performs* and one who *pays* was obliterated, saying (371 U. S., at 139):

". . . This Court applied the equitable principles declared in the Prairie Bank Case so as to entitle the surety to the same equitable claim to the retained fund that the surety in the Prairie Bank case was held to have. Thus the same equitable rules as to subrogation and property interests in a retained fund were held to exist whether a surety completes a contract or whether, though not called upon to complete the contract, it pays the laborers and materialmen. These two cases therefore, together with other cases that have followed them, establish the surety's right to subrogation in such a fund whether its bond be for performance or payment. Unless this rule has been changed, the surety here has a right to this retained fund."

The Miller Act, 40 U. S. C. § 270a *et seq.*, requiring separate bonds for performance and payment, was held not to evidence a congressional intent "to repudiate equitable principles so deeply imbedded in our commercial practices, our economy, and our law as those spelled out in the Prairie Bank and Henningsen Cases." ( 371 U. S., at 140.)

Finally, the Court dispelled any questions raised by dicta contained in *United States v. Munsey Trust Co.*, 332 U. S. 234, 91 L. Ed. 2022, 67 S. Ct. 1599, by limiting its effect to the narrow holding that the government could exercise "the well-established common-law right of debtors to offset claims of their own against their creditors," and thereby defeat a surety's equitable claim to money in the government's hands. (*Munsey Trust* had, however, extended the surety's claim to earned but unpaid progress payments as well as the retained percentages.)

The result was (371 U. S., at 141):

"We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it. . . ."

This holding is squarely applicable here, reading "Foy" for "the Government" and "Mid-Continent" for "the contractor." While the holding itself would appear to subrogate the surety to the rights of all three—the Government, the laborers and materialmen and the contractor—three members of the *Pearlman* court concurred specially, putting their reliance on the right of the surety to stand in the shoes of the *government*, rather than in those of the laborers and materialmen it paid under what they read the majority rationale to be. Either way, the result is the same, and it is generally held that the surety may do both, as well as acquiring the rights of its principal, the contractor.

The First Circuit has referred to this as a "unique accumulation of subrogation rights," serving to "induce a function that is neither ordinary insurance nor ordinary financing." (*National Shawmut Bk. of Boston v. New Amsterdam Cas. Co.*, 411 F. 2d 843, 845 [1st Cir. 1969].)

The function thus "induced," that of guaranteeing completion of building contracts, is one which is vital both to government and to

our economy, dictated by statute in the case of public projects and by prudence in the private sector. Rights are given to the surety, however, neither as a reward nor as an inducement, but because equity requires it. Those rights are described in the following language from *National Shawmut Bk.*, supra:

". . . But the surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material men who have been paid by the surety—who may have had liens; and, not least, in the shoes of the government, for whom the job was completed." (Ibid.)

From our examination of the numerous authorities cited to us we are convinced that the foregoing represents the general rule, accepted overwhelmingly if not universally throughout the various jurisdictions in this country. No contrary decisions have come to our attention. Applying it here, we have the surety asserting the rights of Mid-Continent, of the materialmen, and of Foy. Mid-Continent's claim is non-existent here, because of its assignment to the bank. The materialmen had their equitable claim upon the retained amounts. *Henningsen,* supra; *Pearlman,* supra. Foy had an equitable obligation to pay for material used in the project and for which it was compensated by the owner. In addition it had a right of set off under its subcontract with Mid-Continent, allowing it to apply any money in its hands otherwise due Mid-Continent to any claims for labor or material for which it or the owner "might become liable."

As to the last point the bank argues that, since Foy's prime contract is not in evidence, there is no showing that Foy was *bound* to pay Mid-Continent's unpaid materialmen. In response to a similar contention it was said:

". . . The government's well established right to have the laborers and materialmen paid out of the unpaid progress payments or unpaid balance *does not arise from any legal obligation to such suppliers but simply from its equitable obligation to those who provide it with labor and materials.* United States v. Munsey Trust Co., 332 U. S. 234, 240-241, 67 S. Ct. 1599, 91 L. Ed. 2022 (1947); Henningsen v. United States Fidelity & Guaranty Co., 208 U. S. 404, 410, 28 S. Ct. 389, 52 L. Ed. 547 (1908); National Surety Corp. v. United States, 133 F. Supp. 381, 383-384, 132 Ct. Cl. 724 (1955), cert. denied sub nom., First National Bank in Houston v. United States, 350 U. S. 902, 76 S. Ct. 181, 100 L. Ed. 793 (1955); *see* Pearlman v. Reliance Insurance Co., 371 U. S. 132, 136-139, 83 S. Ct. 232, 9 L. Ed. 2d 190 (1962). We see no reason why that same equitable obligation to the laborers and materialmen should not exist

on the part of the nongovernment owner, who receives the same benefit from those suppliers—construction work and materials—as did the government in the aforementioned cases. Moreover, the non-government owner, like the government, has an interest in seeing its suppliers paid so that the work necessary for completion of the contract can be done with minimum disruption and expense. . . ." (*Framingham Trust Co. v. Gould-National Batteries, Inc.*, 427 F. 2d 856, 858 [1st Cir. 1970].) (Emphasis added.)

The same equitable obligation rests here on Foy, and on the owner, which was assumed is the state of Nebraska or one of its instrumentalities. (That obligation would also be sufficient, in our view, to make the "might become liable" clause of the subcontract operative, if that were needed to bulwark the surety's claim.)

The bank suggests, however, that Kansas has deviated from the main course of American law and charted its own way in this area. Its chief reliance is on *Deposit Co. v. City of Stafford*, 93 Kan. 539, 144 Pac. 852; and *Fidelity and Guaranty Co. v. City of Pittsburg*, 115 Kan. 740, 225 Pac. 83.

In the *City of Stafford* case the surety completed its defaulting principal's contract with the city. Prior to default the contractor had assigned the proceeds of the contract to the bank to secure a credit of $2,000. The bank advanced money only on signed bills for labor and material, each advance being represented by a check drawn to a laborer or materialman. The city, despite the claim of the surety, paid the bank $2,000 in full payment of its claim, and the surety brought suit against both city and bank. In an extensive opinion this court reviewed the decided cases, including *Prairie State Bank* and *Henningsen*, before concluding that equity required the bank to share pro rata with the surety in the loss, and thus account to the surety for a portion of its $2,000. The bank here cites particularly the court's observation:

"We have reached this conclusion after carefully considering the authorities referred to—being disposed to differ from those which might lead to a different result. . . ." (93 Kan., at 550.)

We do not construe this comment as a total rejection of otherwise accepted principles. The holding in that case was based on the court's feeling that:

"This case, however, must be determined by rules applicable to its own facts. The bank, in effect, paid and took over $2000 worth of labor and material claims, and the formality of giving Bortenlanger credit and taking his note is negligible. . . ." (93 Kan., 549-50.)

The net effect of the holding was that, where its money clearly went penny for penny directly into labor and materials *the bank*

*enjoyed subrogation rights equal to but not greater than those of the surety.*

The peculiar nature of the facts in *City of Stafford* was recognized in *Bank v. Insurance Co.,* 109 Kan. 562, 200 Pac. 281, where a bank attempted to recoup its advances to a contractor by an action against the contractor's surety. The notes taken by the bank recited a *purpose* of paying for labor and material (as did Mid-Continent's loan agreement with the bank here), and the bank claimed to be subrogated to the rights of laborers and materialmen who might have been paid from the loan proceeds. Subrogation was denied, the court noting:

". . . The bank was a mere volunteer. It was under no obligation to become involved in the matter of the erection of the school building, except the usual desire of a bank to make profit by loaning its money on interest. In the opinion in the case of *Deposit Co. v. City of Stafford,* 93 Kan. 539, 144 Pac. 852, the authorities on this question were reviewed at length, and the court approved the doctrine of the case of *Prairie State Bank v. United States,* 164 U. S. 227, where it was held that the rights of the surety related back to the date of the original contract, and that the contractors could not transfer to a bank any greater right in the funds than they themselves possessed, which rights were subordinate to those of the owner and the sureties. The supreme court of the United States said in that case:

" 'The bank on the contrary, was a mere volunteer, who lent money to Sundberg on the faith of a presumed agreement and of supposed rights acquired thereunder.' (p. 232.)" (109 Kan, at 564.)

As to the decision in *City of Stafford,* the court said, "It was distinctly held that the case should be determined by rules applicable to the particular state of facts." (Id., at 565.)

The other case urged by the bank on this point is *Fidelity and Guaranty Co. v. City of Pittsburg,* supra. There the contractor borrowed money from a bank and assigned as security money *then due him for work completed.* The assignment was presented to and accepted by the city commission, which ordered payment to the bank, all before default. Only the adoption of an appropriation ordinance and the drawing of an order of payment occurred after default. It was held that the city could not be compelled to pay twice; that by its action in accepting the assignment it bound itself to pay the bank at a time when it could have paid the contractor. Its further action in carrying out its obligation to the bank did not subject it to liability to the surety.

Here, of course, Foy neither paid nor legally bound itself to pay the bank; on the contrary, it still holds the money. Further, the re-

tained money never became *due* Mid-Continent, because of Foy's contractual right to off-set unpaid claims for material.

Both *City of Stafford* and *City of Pittsburg* stand at best for the proposition that a creditor may make a valid assignment of money due him, and that such an assignment when honored by the debtor will be recognized. They do *not* stand for the proposition that one may assign any more than he is entitled to receive.

The bank's argument based on these cases is aptly answered in *National Shawmut Bk. of Boston v. New Amsterdam Cas. Co.,* supra, 411 F. 2d, at 847-8:

"Finally, the Bank asserts that even if the surety may claim as a subrogee, the Bank has a superior claim in equity. This is so, according to the Bank, where earned progress payments are involved and where the surety has bene-fitted from the contractor's application of the loan proceeds to contracts bonded by the surety.

"The position espoused by the Bank originated in cases where *earned prog-ress payments had been paid to an assignee bank* and the surety was attempting, after the default of the contractor, to recover the amounts paid. *See, e. g.,* American Fidelity Co. v. National City Bank of Evansville, 266 F. 2d 910 (D. C. Cir. 1959); Coconut Grove Exchange Bank v. New Amsterdam Casualty Co., 149 F. 2d 73 (5th Cir. 1945); Town of River Junction v. Maryland Casualty Co., 110 F. 2d 278 (5th Cir. 1940); National Union Fire Ins. Co. of Pittsburgh v. United States, 304 F. 2d 465, 157 Ct. Cl. 696 (1962).

"Here the payments were earned but unpaid prior to the contractor's default. Prior to default, the contractor had the right to assign progress payments and *had the Bank received payment,* it could not (absent circumstances amounting to fraud) have been divested by the surety. But upon default, the surety which is obligated to complete the work steps into the shoes of the government—not of the contractor which on default has forfeited its rights. It is subrogated not only to the right of the government to pay laborers and materialmen from funds retained out of progress payments, Prairie State Nat. Bank v. United States, 164 U. S. 227, 17 S. Ct. 142, 41 L. Ed. 412 (1896); Henningsen v. United States Fidelity & Guaranty Co., 208 U. S. 404, 28 S. Ct. 389, 52 L. Ed. 547 (1908); Pearlman v. Reliance Ins. Co., *supra,* but also to the government's right to apply to the cost of completion the earned but unpaid progress pay-ments in its hands at the time of default. United States v. Munsey Trust Co., 332 U. S. 234, 67 S. Ct. 1599, 91 L. Ed. 2022 (1947); Trinity Universal Ins. Co. v. United States, 382 F. 2d 317, 320 (5th Cir. 1967). . . ." (Emphasis added.)

The net result is that, barring the UCC, the surety had an equita-ble lien through its right of subrogation dating back to the time it executed the bond, January 31, 1967; the bank's security interest attached no earlier than February 28, 1967. The remaining question is whether the surety lost the priority of its lien by failing to file under the UCC.

The parties agree that the doctrine of subrogation, as such, survived the enactment of the UCC, citing § 1-103 that:

"Unless displaced by the particular provisions of this act, the principles of law and equity . . . shall supplement its provisions."

The bank argues, however, that *priorities* are governed by the Code, and particularly Article 9. This might well be so if the surety were relying on its contractual assignments of the rights of Mid-Continent or the materialmen. It might then be argued that it was claiming a "security interest" (defined in K. S. A. 84-1-201 [37]) in a "contract right," (defined in 84-9-106 as amended), in which case it would be covered (84-9-102) and filing would be necessary to "perfect" the lien (84-9-302, as amended). But the surety here prefers to abandon whatever *contractual* rights it may have, and to bottom its claim wholly on its purely *equitable* right of subrogation.

We have long recognized the distinction between "conventional" subrogation, based on contract, and "legal" or "equitable" subrogation which arises by operation of law without regard to any contractual relationship. We once put it this way:

". . . Subrogation is a creature of equity invented to prevent a failure of justice, and is broad enough to include an instance in which one party is required to pay what is, between them, the debt of another. It does not depend upon contract nor the absence of contract, but is founded upon principles of natural justice. (*New v. Smith,* 94 Kan. 6, 16, 145 Pac. 880; *Olson v. Peterson,* 88 Kan. 350, 128 Pac. 191; *Crippen v. Chappel,* 35 Kan. 495, 11 Pac. 453.) . . ." (*Blitz v. Metzger,* 119 Kan. 760, 767, 241 Pac. 259.)

And, more directly, in *United States Fidelity & Guaranty Co. v. Maryland Cas. Co.,* 186 Kan. 637, 643, 352 P. 2d 70, we said:

"It has recently been recognized that the right to legal subrogation as distinguished from conventional subrogation arises by operation of law and does not depend upon contract, assignment or agreement. (*Fenly v. Revell,* 170 Kan. 705, 709, 228 P. 2d 905.) . . ."

The surety's right, then, does not depend on contract, while UCC § 9-102 (2) says that Article 9 applies to security interests "created by contract." It follows that a surety's claim to legal or equitable subrogation is not a "security interest" under Article 9 of the UCC, and is not affected by the surety's failure to file a financing statement.

Although this proposition is new to this court, it has been considered elsewhere with near unanimous results. One of the most recent is *Canter v. Schlager,* _____ Mass. _____, 267 N. E. 2d 492 (1971), which surveys the decisions and effectively deals with the

few mavericks among them. The controversy there was between a nonfiling surety and the contractor's trustee in bankruptcy who, the court noted, had the rights of a lien creditor. In holding the UCC inapplicable the Massachusetts Supreme Judicial Court quoted with approval from *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 429, 206 A. 2d 49, 55:

". . . Of basic importance is the general rule of Section 9-102 (2) that Article 9 'applies to security interests *created by contract*.' Rights of subrogation, although growing out of a contractual setting and ofttimes articulated by the contract, do not depend for their existence on a grant in the contract, but are created by law to avoid injustice. Therefore, subrogation rights are not 'security interests' within the meaning of Article 9. . . ." (Emphasis supplied.)

It went on to say (267 N. E. 2d, at 494-95):

"Our conclusion that filing under the Code is unnecessary to preserve the priority of a surety's right of subrogation over the rights of a construction contractor's trustee in bankruptcy is reinforced by decisions of other courts. Jacobs v. Northeastern Corp., *supra* (receiver against surety, Pennsylvania law). National Shawmut Bank v. New Amsterdam Cas. Co. Inc., 411 F. 2d 843 (1st Cir.) (assignee bank against surety on Federal contract, Massachusetts law). Framingham Trust Co. v. Gould-Natl. Batteries, Inc., 427 F. 2d 856 (1st Cir.) (assignee bank against surety, Massachusetts law). Home Indem. Co. v. United States, 433 F. 2d 764 (Ct. Cl.) (surety on Federal contract against trustee in bankruptcy of assignee finance company, Illinois law). National Sur. Corp. v. State Natl. Bank, 454 S. W. 2d 354, 356 (Ky.) (surety against assignee bank, Kentucky law). Aetna Cas. & Sur. Co. v. Perrotta, 62 Misc. 2d 252, 308 N. Y. S. 2d 613 (surety against assignee finance company, New York law). Contrary decisions in United States v. G. P. Fleetwood & Co. Inc., 165 F. Supp. 723 (W. D. Pa.) (surety on subcontract against trustee in bankruptcy of sub-contractor), and Hartford Acc. & Indem. Co. v. State Pub. Sch. Bldg. Authy., 26 D. & C. 2d (Pa.) 717 (surety against assignee bank), are not authoritative with respect to Pennsylvania law after the decision in Jacobs v. Northeastern Corp., *supra*. So far as Maryland Cas. Co. v. Mullett, 295 F. Supp. 875 (W. D. Pa.), is contrary, it also departs from Pennsylvania law. The Uniform Commercial Code is to be 'liberally construed and applied to promote its underlying purposes and policies,' which include a purpose and policy 'to make uniform the law among the various jurisdictions.' [UCC.]"

Some courts which have reached this conclusion have been impressed, as are we, by the rejection from the Code as adopted of a proposed § 9-312 (7) which would have specifically subordinated the lien of a surety to that of a later lender with a perfected security interest. The Editorial Board's reasons for the deletion of this proposal from the Code were:

"The Surety Companies' representatives convincingly took the position that subsection (7) as it stands is a complete reversal of the case law not only of the Supreme Court of the United States but also of the highest courts of most of the states. They cited Prairie State Bank v. U. S., 17 S. Ct. 142, 164 U. S. 227, 41 L. Ed. 412 (1896); Henningsen v. U. S. F. & G., 28 S. Ct. 389, 208 U. S. 404, 52 L. Ed. 547 (1908); U. S. v. Munsey Trust, 67 S. Ct. 1599, 332 U. S. 234 (1947), at 240, 91 L. Ed. 2022; 9 Am. Jur. 72, §§ 114, 115; 43 Am. Jur. 939, § 197 *et seq.*; 60 C. J. Subrogation § 87; Stearns Law of Suretyship, 5th Ed. (1951), page 472; Appeal of Lancaster County Natl. Bk., 304 Pa. 437, 155 A. 859, 76 A. L. R. 912 (1931); and 127 A. L. R. 974, 976.

"The typical case involved is a case in which a surety company, as a prerequisite to the execution of a performance bond, requires a contractor to make an assignment of all moneys coming to the contractor from the owner. Later, the contractor goes to a bank and obtains a loan presumably or actually for the purpose of enabling him to perform his contract.

"Under the cited case law, the surety's rights come first as to the funds owing by the owner unless the surety has subordinated its right to the bank. Subsection (7) of the Code as written would reverse the situation and give the bank priority in all cases.

"Under existing case law, both the contractor and the bank are in a position to bargain with the surety which may or may not be willing to subordinate its claim. Under subsection (7) as written in the Code the surety company would have nothing to bargain about.

"It was the feeling of the Editorial Board that existing law should not be disturbed particularly as the proposed change would be likely to be a point of controversy in every legislature in which the Code is introduced." (Uniform Laws Annotated, Uniform Commercial Code, Changes in Text and Comments, at 25-26 [1953].)

We thus have a clear recognition of the prevailing rule on the part of the draftsmen of the Code and a considered and deliberate decision, made only after reaching a tentative conclusion to the contrary, that they should not propose a change. We think this convincingly demonstrates an intent, imputed to the legislature which adopted it, that the Code should not be applicable to or alter the long established priorities in this area. As the First Circuit put it (*National Shawmut Bk. of Boston v. New Amsterdam Cas. Co.,* supra, 411 F. 2d, at 849):

".  .  . It may well be—although we express no opinion—that to subject sureties to the filing requirements of the Code would improve and rationalize the system of financing public contracts. But equitable subrogation is too hardy a plant to be uprooted by a Code which speaks around but not to the issue."

We therefore conclude that the trial court erred in finding that the bank had a first and prior right to the contract proceeds in the

hands of Foy. The surety, having paid out more than that amount, is entitled to the entire fund.

The judgment is therefore reversed with directions to enter an appropriate judgment in favor of the surety, United States Fidelity and Guaranty Company, in accordance with the views expressed herein.

APPROVED BY THE COURT.