**James R. McATEE, as Trustee in Bankruptcy for Chavis Construction Company, Inc., Plaintiff,**

**v.**

**UNITED STATES FIDELITY AND GUARANTY COMPANY, Defendant.**

**No. PCA 74–112.**

United States District Court,
N. D. Florida,
Pensacola Division.

April 1, 1975.

**12**

J. R. McAtee, Pensacola, Fla., for plaintiff.

Charles R. Timmel, Ft. Walton Beach, Fla., for defendant.

DANIEL HOLCOMBE THOMAS, District Judge.

The above-styled cause, a Miller Act case, was heard by the Court, without a jury, on stipulated facts and arguments of counsel and taken under submission on March 5, 1975. Having considered the stipulated facts, exhibits and arguments of counsel, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. This action was brought by the plaintiff, James R. McAtee, as Trustee in Bankruptcy for Chavis Construction, Inc. (Chavis) to recover in behalf of the bankrupt estate funds in the possession of the defendant, United States Fidelity and Guaranty Company (USF&G), said funds being payments made by the Unit-

ed States pursuant to two construction contracts with the bankrupt Chavis. The plaintiff also seeks to retain for the bankrupt estate an additional payment made by the United States and now in the plaintiff's possession. The defendant denies that the plaintiff is entitled to any of the payments and, accordingly, seeks to recover the payment in the plaintiff's possession. In addition, both parties seek a determination as to which of them would be entitled to a portion of the contract price due on one of the contracts but withheld by the United States as liquidated damages, if such were eventually paid.

2. USF&G is the surety on Performance Bonds and Labor and Material Payment Bonds issued in conjunction with two construction contracts entered into by Chavis with the United States.

3. By contract dated September 14, 1970, contract # 14–16–0004–272 in the amount of $522,165.66, Chavis contracted with the United States for the construction of a marine laboratory in Panama City, Florida. Back charges and change orders in the sum of $13,036.11 brought the total contract price to the sum of $535,201.77.

4. Chavis and USF&G, as principal and surety, respectively, executed and delivered to the United States, as obligee, their Performance Bond in the sum of $522,165.66 and their Labor and Material payment bond in the sum of $261,182.83, both dated September 17, 1970.

5. By contract dated April 24, 1970, contract # 62467–70–7040 Chavis contracted with the United States for repairs to building 672, Naval Air Station, Pensacola, Florida. Change orders in the sum of $165.10 increased the total contract price of $90,292.00 to the sum of $90,457.10.

6. Chavis and USF&G, as principal and surety, respectively, executed and delivered to the United States, as obligee, their performance bond in the sum of $90,292.00 and their labor and mate-

rial payment bond in the sum of $45,146.00, both dated September 17, 1970.

7. By letters to USF&G and to the United States Department of Interior, dated April 4, 1972, Chavis advised that it would be unable to complete the construction of the marine laboratory and called upon USF&G to complete.

8. By correspondence dated April 11, 1972, from the United States Department of Interior to Chavis, the aforesaid contract was defaulted and USF&G was requested and permitted to complete the contract.

9. By correspondence dated April 4, 1972, to the officer in charge of construction, Pensacola Naval Air Station, Pensacola and USF&G, Chavis advised that it was unable to complete the contract and requested USF&G to complete the job.

10. Thereafter USF&G proceeded to complete the contract for the marine laboratory under its performance bond and to pay outstanding labor and material bills under its payment bond. The cost to USF&G of completion was $8,998.34, and the labor and materials paid for by USF&G were in the sum of $90,620.15. Such costs were paid by USF&G between April 21, 1972 and October 11, 1972.

11. Payments received by USF&G from the United States totalled $43,026.-17. In addition, one payment in the amount of $1,346.84 is being held by the plaintiff.

12. Receipts and payments on the contract for the marine laboratory as set forth above are summarized as follows:

| | |
|---|---|
| Labor and Materials | $90,620.15 |
| Completion | 8,998.34 |
| TOTAL PAID | $99,618.49 |
| Receipts from U.S.A. (Including $1,346.84 held by Plaintiff) | $44,373.01 |
| NET LOSS TO USF&G | $55,245.48 |

13. In addition to the above, the United States has withheld payment of $21,300.00 as liquidated damages under the contract for 142 days delayed completion at the rate of $150.00 per day. USF&G and the Trustee have contested some part of the liquidated damages, but the United States has refused to pay any of such retained balance of the contract.

14. On the Naval Air Station job in Pensacola, USF&G was called upon to pay the sum of $1,675.00 for labor and materials under its labor and material payment bond and received from the United States the sum of $465.00 as final payment on the contract price. This resulted in a net loss to USF&G of the sum of $1,209.90 under its bond. These receipts and disbursements were made during November, 1972.

15. Chavis filed a voluntary petition in bankruptcy and was adjudicated a bankrupt on July 14, 1972.

16. James R. McAtee, plaintiff herein, was appointed Trustee in Bankruptcy for Chavis Construction Company, Inc., on August 14, 1972 and is presently serving in that capacity. It is in such capacity that plaintiff has filed this present suit seeking payment into the bankrupt estate the sums received by USF&G from the United States on the two contracts and to retain for the estate of the said bankrupt and the general creditors of the estate the payment from the United States now in his possession in the sum of $1,346.84.

17. USF&G did not file a financing statement or Uniform Commercial Code form with the Secretary of State nor with the Clerk of the Court of either Bay or Escambia Counties showing a security interest of USF&G in the above mentioned contracts.

18. Plaintiff filed this instant suit on or about September 4, 1974 in four counts. In Counts III and IV of his complaint plaintiff demanded an accounting of defendant. Defendant in answer to said counts acknowledged that plaintiff was entitled to an accounting and has furnished the same. Plaintiff is satisfied with said accounting and abandons those claims of Counts III and IV.

19. Plaintiff claims his interest in the contract proceeds on behalf of the estate of the bankrupt based upon the failure of the defendant, USF&G to file a financing statement or Uniform Commercial Code form with the Secretary of State or the Clerks of the Court of Bay and Escambia Counties, the counties in which the respective contracts of Chavis with the United States were to be performed and that defendant failed to put plaintiff as Trustee on notice of its security interest in the contracts. Defendant, by its answer admits that it has not filed a financing statement with the Secretary of State or with the Clerks of the Court of Bay or Escambia Counties. Defendant further admits receipt of payments from the United States. The defendant, by its answer and amended answer claims the right to the contract proceeds on the basis of its equitable rights of subrogation and to the extent that they did not exceed the cost to defendant to complete the contract and to pay for labor and materials furnished on the contract.

20. No assignment of its contract rights was made by Chavis to USF&G, and USF&G relies entirely upon a theory of equitable subrogation to establish its rights to the payments.

## CONCLUSIONS OF LAW

On the basis of the foregoing facts, the Court makes the following conclusions of law:

1. The Court has jurisdiction over all the parties and subject matter of this litigation under the Statutes of the United States by reason of diversity of citizenship among the parties and the amount in controversy.

2. The plaintiff herein asserts that as the trustee of the bankrupt contractor's estate he has prior right to payments made by the United States to the defendant-surety subsequent to the contractor's default and on account of the surety's completion of the construction contracts. Plaintiff bases his right to priority upon the defendant's failure to file an effective financing statement within the provisions of Article 9 of the Uniform Commercial Code as adopted in Florida.

3. Without a lengthy discussion of the precedents, suffice it to state that the doctrine is well established that a surety who completes a contract has an equitable right of subrogation to the rights of the owner (United States) to withhold payments to the contractor upon default. *Prairie State National Bank v. United States*, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896). Accordingly, a surety on a payment bond given by a contractor under the Miller Act, 40 U.S.C. § 270a (1964), who by reason of the contractor's default has been compelled to pay debts of the contractor for labor and materials and to complete the contract, is entitled by subrogation to reimbursement from funds otherwise due the contractor but withheld by the United States as a result of the contractor's default. And, at least prior to enactment of the Code, this is so even though the contractor has become bankrupt and the United States has turned the withheld funds over to the contractor's trustee in bankruptcy. *Pearlman, Trustee in Bankruptcy v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962).

4. Subsequent to passage of the Code in many states, there has been considerable discussion by the courts and commentators as to whether the surety's equitable subrogation claim constitutes a "security interest" under the Code and therefore can only be protected by compliance with the provisions of Article 9. However, all the still viable decisions to-date hold that the doctrine of equitable subrogation in suretyship cases does not create a security interest under the Code and has not been displaced or controlled by Article 9. *In Re J. V. Gleason*, 452 F.2d 1219 (8th Cir. 1971).[1]

---

1. The cited case provides a good discussion of the cases so holding and the reasoning behind the decisions.

5.  Although the cases cited concerned Article 9 as it has been adopted in states other than Florida, the plaintiff has not cited any material or given any reason for thinking that Florida's adoption of Article 9 would or should be construed differently.

6.  The defendant-surety is therefore entitled to the contract payments already in its possession and also to the payment of $1,346.84 presently in the plaintiff's possession. As to the funds still held by the United States as liquidated damages, the Court finds that those funds are not properly before it in this case and, therefore, does not make any determination as to them.

A decree will be entered in accordance herewith.