524 So.2d 439 (1988)
TRANSAMERICA INSURANCE COMPANY, Appellant,
v.
BARNETT BANK OF MARION COUNTY, N.A., Appellee.
No. 86-1328.
District Court of Appeal of Florida, Fifth District.
March 24, 1988.
Rehearing Denied May 6, 1988.
*441 Robert E. Morris of Morris & Rosen, P.A., Tampa, for appellant.
Tim Haines and Young J. Simmons of Green, Simmons, Green, Hightower & Gray, P.A., Ocala, for appellee.
COWART, Judge.
This case involves the question of priority between a bank which financed a contractor, and a surety company which guaranteed the contractor's payment or performance, as to earned but unpaid sums due from an owner to a contractor when the contractor defaults on a construction contract[1].

I. BACKGROUND
To place this case in proper perspective, a general discussion of the relationship between owners, contractors, surety companies, and financing banks is in order. To meet conditions often imposed by owners in construction contracts, the contractor pays a surety company to enter into payment and performance surety bonds in which the surety company guarantees to the owner that in the event the contractor fails to pay laborers, material suppliers, and subcontractors, or fails to complete performance, the surety will make such payments and complete such performance for the benefit of the owner. As a condition of issuing such bonds, the surety normally requires the contractor to agree in writing (1) to indemnify the surety for any sums expended on its guaranty and (2) to assign to the surety as security for the indemnity agreement all sums the contractor is entitled to receive from the owner under the construction contract. This assignment to the surety may provide that it constitutes a "security interest," but it may also expressly provide that such security interest is in addition to all of the surety company's legal and equitable remedies.[2] Peculiarly, the surety customarily does not file its assignment as a security interest under Article 9 of the Uniform Commercial Code (U.C.C.), section 679.302(1), Florida Statutes.
The contractor may already have an established line-of-credit financing agreement with a bank, giving the bank a security interest in proceeds under future construction contracts. If not, however, after the construction contract and surety bonds have been negotiated,[3] the contractor usually seeks to finance his performance of the construction contract by making some loan arrangements with a bank. As collateral for the bank's loan, the contractor also gives the financing bank an assignment of the payments to become due the contractor under the construction contract. The bank usually perfects its security interest[4] by filing under U.C.C. § 9-302(1) (§ 679.302(1), Fla. Stat.).
Construction contracts usually provide for the owner to make progress payments as the work advances; these payments *442 may be made to the contractor, or directly to the bank if the owner has been notified of the bank's assignment. It is also customary for the construction contract to permit the owner to hold back a certain percentage, usually ten percent, of the money earned by the contractor until satisfactory completion of the entire work under the construction contract. This is referred to as "retained percentages" or retainage. If the contractor fails to complete the job, the owner may hire a second contractor to complete the job, apply to the cost of completion the unpaid balance of the construction contract price still in the owner's hands, and collect from the performance bond surety any cost of completion in excess of the original contract price; or the owner may merely call on the performance bond surety to come in and complete the job. The original contractor, whether or not it completed the job, may also leave labor and material claims unpaid for which the payment bond surety is liable.
When the contractor defaults, or becomes unable to pay labor and material claims, and the surety learns that it will probably incur expense in performing its guarantee, controversy arises between the surety and the financing bank.

II. THE ISSUES IN THIS CASE
In this case, the bank argues that the surety's assignment, like the bank's assignment, constitutes a security interest in the construction contract payments, the perfection of which requires filing under U.C.C. § 9-303 and § 9-302(1) (§ 679.303 and § 679.302(1), Fla. Stat.). The bank further urges that while the surety's assignment may be first in point of time, because it was not filed, the bank's later acquired but perfected security interest has priority over the surety's security interest under U.C.C. § 9-312(5) (§ 679.312(5)(a), Fla. Stat.), which provides that conflicting security interests in the same collateral rank according to priority in time of filing or perfection.
The surety has three primary arguments: (1) its assignment is prior to that of the bank and its assignment is not subject to the U.C.C. filing requirement because it is a transaction within U.C.C. 9-104(f) (§ 679.104(6), Fla. Stat.), which excludes from U.C.C. coverage "a transfer of a right to payment under a contract to an assignee who is also to do the performance under the contract ..."; (2) that the U.C.C. filing requirement is merely to give notice or knowledge, that under general statutory and common law, a prior right is good against a subsequent "purchaser" or claimant if the subsequent claimant has actual knowledge of the earlier interest, and that when the construction contract requires a bond the financing bank knows, or should know, that the contractor is obligated to a surety and that the surety has a security interest (a classical "good faith" exception argument); and (3) that aside from its written assignment from the contractor, the surety has an equitable remedy of subrogation which a long line of federal cases has held to be superior to the bank's assignment.

III. THE FEDERAL VIEW[5]
The legal controversy between financing banks and sureties has existed for over eighty years; the great bulk of the litigation being in federal courts and involving United States government contracts and payment of performance bonds required by federal statutes[6] on federal government jobs. Commencing in 1894, a series of federal cases established federal precedent *443 to the effect that a surety which has completed performance of a federal construction contract, or which has paid for labor and materials, had subrogation rights that were generally superior to those of banks and others who had assignments from the defaulting contractor.[7] It would serve little purpose to analyze here all of the factors influencing the federal courts in each case. It is important to note, however, that the early cases were decided during a time when assignments of claims against the federal government were almost all prohibited, and were decided in the absence of any applicable statute providing a system of filing of claims and directing that priority be based on the date of filing of competing claims. Even after a federal Assignment of Claims Act[8] was enacted in October, 1940, later federal cases[9] largely relied on earlier precedent, and regularly held for the surety except when the surety's claim came up against interests of the federal government.[10] The federal Court of Claims especially ruled consistently in favor of the surety[11]. However, the Fifth Circuit Court of Appeals recognized that the new federal Assignment of Claims Act should change the result of prior precedent and, in the absence of a controlling recording statute, that court undertook to balance the equities between the financing bank and the surety. In doing so, that court often held in favor of the bank.[12]
To support its equitable subrogation argument, the surety in this case relies on federal decisions. However, as to the issue in this case, we do not feel persuaded to follow the federal cases for the following reasons, among others:
(1) The position of the United States as owner, and often as a party litigant, may make the determination of the priorities between the financing bank and surety a matter of federal law, but when the United States, the federal Assignment of Claims Act, and the federal Miller Act are not involved, the priority question is a matter of state law, and state decisional and statutory law, such as the U.C.C. in Florida, should control.
(2) The federal cases developed the equitable subrogation theory in favor of the surety in cases involving federal construction contracts, with the United States as the owner, during the pre-1940 period when neither the bank nor the surety could acquire an assignment "valid" against the United States. The federal Assignment of Claims Act of 1940 validated assignments to banks but not to sureties, thereby motivating the federal courts to continue to apply the equitable subrogation theory in order to continue to give the surety a remedy.
(3) In ruling in favor of the surety, the federal cases stressed various factors and viewpoints which are not especially relevant to doing justice between civil litigants in a state judicial system. One such viewpoint is that the surety ought to win because *444 it directly helped the United States by completing construction work under a government construction contract, whereas the bank was but a money lender whose only equity arose when it could show its money was actually used to pay labor and materials which discharged obligations for which the surety would otherwise have been liable.
(4) The federal cases held that the surety in paying labor and materialmen became subrogated to their rights but did not recognize that those laborers and materialmen had no legal rights against the United States as owner and, under the Miller Act, had rights only against the payment bond surety and against the contractor, whose payment the surety had guaranteed. The federal cases also held that by completing the performance of a defaulting contractor, the surety became subrogated to the contractor's rights but these cases did not recognize that the defaulting contractor had only the conditional right to receive from the owner sums earned under the contract and that the contractor may have made an assignment of those sums valid under state law. The federal courts finally held that the surety, by performing under its bond, became subrogated to the rights of the United States, as owner. These holdings stretched the equitable subrogation theory rather thin in view of the fact that the purpose of the surety bond was to comply with the federal Miller Act and the purpose of that Act was to give laborers and materialmen protection which they would not otherwise have under mechanics' lien statutes. These holdings further ignored the fact that the United States, as owner, had the right under government construction contracts to receive performance by the contractor and, under the surety's bond, had the right to have the contractor's performance guaranteed by the surety, and that the United States, as owner, had only the duty to pay money for performance but had no right to receive money to which right the surety could, by performing the contractor's duties, become subrogated.
Accordingly, we find it to be in the best interest of the law of the state of Florida to not follow federal precedent and to decide the issues in this case based on our understanding of controlling state law.

IV. THE SURETY'S ASSIGNMENT IS A SECURITY INTEREST UNDER THE U.C.C.
We hold that the surety's assignment from a contractor, although conditional or contingent upon the surety's liability following the contractor's default, constitutes a security interest subject to the filing and perfection requirements of U.C.C. § 9-303 and § 9-302(1) (§ 679.303 and 679.302(1), Fla. Stat.). We reject the argument that U.C.C. § 9-104(f) (§ 679.104(6), Fla. Stat.) was designed to exclude from U.C.C. coverage an assignment to secure a surety who has a contingent liability to complete performance of a construction contract on the contractor's default. Rather that section was intended to exclude transfers, not for security, in which the assignee of the construction contract takes over the contract and receives an assignment of rights and assumes the contractor's duty of performance.[13]

V. THE U.C.C. FILING REQUIREMENT HAS NO "GOOD FAITH" EXCEPTION
Traditional statutes requiring filing or recording to give notice,[14] usually contain a "good faith" limitation[15] under *445 which it is generally held that when two persons make competing claims to the same property interest, the first interest, even if not filed or recorded, is good against a subsequently acquired interest if the subsequent interest is acquired with actual knowledge of the earlier interest. Although, admittedly, it is not conclusively clear, it appears to us from the drafting history of U.C.C. § 9-312(5) (§ 679.312(5), Fla. Stat.) that a "good faith" limitation was intentionally omitted from the U.C.C. provision and, therefore, none should be implied by the courts.
Under the general priority rule, U.C.C. § 9-312(5) (§ 679.312(5), Fla. Stat.), the secured party who first perfects his interest has priority, and it makes no difference whether or not he knows of any other interest at the time he acquires or perfects his own interest. There are many good reasons for this approach. Because a good filing system greatly facilitates and expedites commerce, strict requirements that reward prompt compliance and penalize noncompliance are desirable. Because knowledge is a subjective question, easy to allege and argue but difficult to disprove, its controlling importance in a commercial system greatly impedes commerce and promotes uncertainty, litigation, and expense. A superior filing system discards knowledge as a determinant fact and instead turns on some easily determined objective event, such as the date of filing in a public office. For the same reason, the U.C.C. first-to-file priority rule, strictly construed, allows a secured party who has first filed, such as a financing bank, to make subsequent advances to a borrower, such as the contractor, without each time having to check for later filings as a condition of protection. In all cases all parties can protect themselves conveniently by inquiring only as to prior filed interests.

VI. SUBROGATION
There appear to be two types of subrogation. The first is contractual or conventional subrogation, which varies in its form according to agreement, but which is essentially a type of reimbursement agreement or assignment of rights. Conventional subrogation is usually based on an agreement between the parties that the party paying the debt will be subrogated to the rights and remedies of the original creditor. Contractual subrogation also arises where contracting parties agree that, if and when under certain circumstances the first party pays or performs some obligation owed to, or by, the second party to a third person, the first party will be subrogated to the legal rights of the original obligee or obligor. This is the usual provision in insurance policies providing that after payment to the insured, the insurer will be subrogated to the rights of the insured against a third person, such as a tortfeasor.
The second type of subrogation is the remedy known as "equitable subrogation." This concept originated in equity to provide a remedy to one (the plaintiff) whose property had been used, more or less inadvertently, to satisfy and discharge an obligation of another (the obligor or debtor) under circumstances such that if the plaintiff were not subrogated to the rights of the obligee (the creditor) against the obligor (debtor), the obligor (debtor) would be unjustly enriched at the expense of the plaintiff.[16] In effect, the remedy of equitable subrogation merely implies in law a reimbursement agreement or assignment of rights in favor of one (the plaintiff) whose property was used to discharge the obligation of another. However this just does not seem to describe the situation of the modern day payment or performance bond surety who regularly and in the course of business for profit undertakes the calculated risk of guaranteeing to an owner payment and performance by a contractor. *446 When such a surety performs under its bond it is merely fulfilling its own undertaking. Such a surety has ample opportunity to make any contractual subrogation agreement it desires, not only with the contractor,[17] but also with the owner for whose protection the surety bonds are issued. The original purposes of equitable subrogation do not appear to exist where a surety has, as appellant surety company has in this case, intentionally and contractually, for a consideration, obligated itself to perform a contractor's contractual duties and the surety is not seeking to enforce the original obligee's (the owner's) rights against the original obligor (the contractor) or vice versa.
Under the U.C.C. in Florida today, a surety company, merely by first filing its earlier assignment from the contractor, can prevail against a financing bank which later acquires a security interest. If the financing bank has a security interest earlier perfected by filing, the surety company can easily ascertain this fact and protect itself by declining to issue a bond at all, or by not issuing the bond unless the bank subordinates its interests. Here the appellant surety company has failed, neglected, or refused to file and perfect its security interest under the U.C.C. and has thereby created the conflict between its interests and those of the financing bank. The remedy of equitable subrogation is customarily denied to a party who could have protected himself but who has been negligent in doing so. Equity aids the vigilant. Likewise, equitable subrogation is governed by the operation of equitable principles and is not applied where it works an injustice to third parties. Having the convenient and practical remedy of filing its security agreement under the U.C.C., the surety company is not entitled to disregard it and rely on the remedy of equitable subrogation to ambush a financing bank which has dutifully filed its security interest as provided by law.[18] Our holding in this case is consistent with, and parallel to, Waterhouse v. McDevitt & Street Co., 387 So.2d 470 (Fla. 5th DCA 1980), in which this court held that a bank with a perfected security interest had priority over a surety which did not perfect its security interest but which claimed a superior right by virtue of the doctrine of equitable subrogation.

VII. A LIMITATION ON THIS DECISION
So far, we have generally discussed the doctrine of equitable subrogation without specifically analyzing that doctrine in the context of the bank versus surety priority controversy. The legal controversies between banks and sureties relate to three categories of construction proceeds: (1) predefault payments the bank has received under its assignment either through the contractor or directly from the owner; (2) funds (usually progress payments less retainage) earned by the contractor by performance and payment of labor and materials before default, and actually due and payable to the contractor by the owner, but not paid over to the contractor or bank and still held by the owner; and (3) the balance of the construction contract price in the owner's hands which includes the retained percentages and all progress payments unearned *447 by the contractor before default and the final payment due under the construction contract.
This appeal, and this opinion, involve category (2) funds only. However, because we perceive that the rationale of this opinion may be urged to be extended to category (3) funds, we continue, not by way of obiter dicta to extend our holding herein beyond the issues presented by this appeal, but, to the contrary, to state our intent to limit this opinion to category (2) funds and to explain why this rationale is inapplicable to controversies involving category (3) funds. As defined above, category (3) funds are only those unearned funds in the owner's hands at or after the moment of the contractor's default. The contractor's default changes all legal relationships between all the parties. First, the contractor's default, unwaived by the owner, breaches the construction contract, giving the owner a cause of action against the contractor on the construction contract. Because of his default, the contractor is not entitled to category (3) funds from the owner. A financing bank, even one which has perfected its assignment from the contractor, is, likewise and for the same reason, not entitled to those funds as assignee of the contractor.[19]

VIII. COMMON LAW SETOFF
Appellant surety company also contends that the partial summary judgment defeated its common law right of setoff. The trial court ruled that the priority between the financing bank and the surety company should be determined on a bond by bond or job by job basis.[20] The surety company asserts that on some of these bonds, there may remain a surplus in category (2) funds[21] after materialmen, laborers, and other claimants are paid, and that this surplus should be applied as a setoff, against any funds the surety may be required to pay out over and above what it may receive under other contracts and bonds, before the financing bank is entitled to any funds pursuant to its assignment from the contractor. However, the financing bank with a perfected security interest and priority over the surety is entitled to all category (2) funds not exceeding the contractor's obligations to the financing bank. The surety company would only be entitled to category (2) funds should any remain after the financing bank is paid, and this right is not affected by the lower court's holding that the determination of priority to these funds should be on a bond by bond basis.

IX. CONCLUSION
The partial summary judgment in this case, finding that the security interest of the financing bank, appellee Barnett Bank of Marion County, N.A., which was perfected under the U.C.C., has priority over all claims by the surety, appellant Transamerican Insurance Company, which did not perfect its security interest under the U.C.C., as to contract funds earned by the contractor, G. Paul Turner Construction Inc., before default, but not paid to the contractor, is
AFFIRMED.
UPCHURCH, F.D. Jr., Judge, Retired, concurs.
SHARP, C.J., dissents with opinion.
SHARP, Chief Judge, dissenting.
In my view, the doctrine of equitable subrogation entitles the surety, to the extent of its performance and loss under its bond pertaining to the contract, to the unpaid *448 contract funds held by the owner which had been earned by the contractor prior to its default. Furthermore, the surety's equitable right of subrogation is not a security interest which requires perfection by filing a financing statement to obtain priority under the U.C.C. Therefore, the surety should prevail in this declaratory judgment suit over the bank, who holds an assignment of the contractor's rights under the contract, and who had perfected its security interest by filing its financing statement before the surety.
The facts in this case are not unique. In 1983 and 1984, G.P. Turner Construction, Inc. (the contractor) contracted with various public bodies (Florida Department of Transportation, Putnam County, St. Augustine Airport Authority and St. Johns County) to perform construction projects. As required by Florida law,[1] Turner procured from Transamerica Insurance Company (the surety) payment and performance bonds for the benefit of each public body, for each project or contract. Turner had previously entered into an Indemnity Agreement with Transamerica, which provided that Transamerica would execute bonds for Turner's construction projects, as requested.
This Agreement also assigned to Transamerica all of Turner's rights under any bonded contract issued by Transamerica, as well as all of Turner's other rights under any other contract, in the event the surety suffered a loss on any bond. The two controlling paragraphs assign to Transamerica:
(a) All the rights of the contractor in, and growing in any manner out of, all contracts
(e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the bonds and all other contracts whether bonded or not in which the contractor has an interest.
Furthermore, the Agreement provided it would constitute a security agreement and a U.C.C. financing statement, without restricting any other theory of recovery available to Transamerica. Transamerica perfected its interest under the U.C.C. by filing in December of 1984.
After executing the Indemnity Agreement with Transamerica, Turner obtained a series of loans from Barnett Bank of Marion County, N.A. to finance its construction projects. Barnett obtained security agreements which encompassed Turner's accounts, contract rights, chattel paper, and general intangibles. Barnett also perfected by filing a financing statement on April 27, 1984, ahead of Transamerica's filing. Barnett's funds were loaned to Turner, pursuant to their financing arrangements, and the trial judge found Turner used the funds in the normal course of its business operations.
In 1984 and 1985, Turner defaulted on its contracts. Transamerica entered into agreements with all the public authorities to fulfill its obligations under the bonds. The sole issue in this case is whether Transamerica or Barnett is entitled to those funds which were earned by Turner, but unpaid by the particular owner, at the time of Turner's default.
Prior to the adoption of the Uniform Commercial Code in Florida in 1965,[2] it was well established that the surety was entitled to sums "earned but unpaid" at the time of default as against bank, who was an assignee of the contract.[3] This principle is stated in a trilogy of three old Florida Supreme Court cases: Phifer State Bank v. Detroit Fidelity & Surety Co., 97 Fla. 538, 121 So. 571 (1929); Florida East Coast Railway Co. v. Eno, 99 Fla. 887, 128 So. 622 (1930); and Union Indemnity Co. v. City of New Smynra, 100 Fla. 980, 130 So. 453 (1930).
In Phifer, the court ruled that a surety, who had completed a construction contract pursuant to its bond after the default of a contractor, was entitled to the balance of *449 funds owed by the owner, as opposed to a bank to whom the contract proceeds, had been assigned. The court relied on the principle of subrogation, and cited federal cases as well as cases in three other states (Michigan, Ohio and Massachusetts).
In Florida East Coast Railway Co., the court further explained the doctrine. As to the unpaid, earned funds in the hands of the owner, the surety has first claim after completing the contract, because it is subrogated to the position of the owner. After default, the owner has the right to retain unpaid funds, and apply them if needed to complete the contract. The bank, as assignee of the contractor, has no greater rights than the contractor to the funds. The surety steps into the position of the owner, and can apply any unpaid funds to complete the project, to the extent of its obligations under the bond.
In Union Indemnity Co., the court also ruled that a surety prevailed over a bank who was an assignee of a construction contract, as to retainages held by the owner, after the surety had completed the contract at a loss. It said:
When the surety undertook the completion of the construction, it became subrogated, to the extent necessary to protect it from loss, to all the rights which the city might have asserted as against the funds in its hands.
Union Indemnity Co., 130 So. at 456.
In 1951, the Florida Supreme Court cited these three cases as authority for a short opinion, which simply ruled for a surety in a dispute with a bank-contract assignee.[4] Federal courts in Florida, applying Florida suretyship law, still cite these cases: See Broward County, Florida Commission for the Use and Benefit of General Electric Co. v. Continental Casualty Company, 243 F. Supp. 118 (S.D.Fla. 1965); Aetna Insurance Company v. Poole & Kent Company, 303 F. Supp. 963 (S.D.Fla. 1969).
As Judge Cowart points out in his opinion, Florida (as do other jurisdictions) recognizes two kinds of subrogation: "conventional" or "legal."[5] "Conventional" subrogation is based on a contract right, such as may arise from an assignment. "Legal" subrogation (or equitable subrogation) arises from operation of law when a person who discharges a legal duty of another, does so to protect his own interest, or because he is under a legal duty to do so. Eastern National Bank v. Glendale Federal Savings and Loan Association, 508 So.2d 1323, 1324 (Fla. 3rd DCA 1987). The latter is typically the category into which are placed sureties who complete construction contracts, and suffer a loss, pursuant to their bond obligations.[6]
When the Uniform Commercial Code was passed by the various state legislatures in this country, there was an initial flurry of speculation on the part of authors of law review articles and books[7] as to whether or not a surety's right of equitable subrogation would be considered to be a security interest, which must be perfected by filing a U.C.C. financing statement, and whether such an interest would be exempted from the filing requirement by section 9-104(f), (§ 679.104(6), Fla. Stat. (1983)).[8] However, the overwhelming and essentially unanimous post-U.C.C. decisions in this country, federal as well as state courts, have held that (1) the surety's equitable right of subrogation *450 is not a consensual security interest, (2) no U.C.C. filing is necessary to perfect the surety's interest, and (3) the surety's interest continues to be, as it was under pre-Code law, superior to the claim of a contract assignee, such as a bank.[9] The only "exception" to this rule is expressed in peculiar factual situations, not applicable to this case, where the surety was actively involved in obtaining a loan from a financer which was used with its knowledge and consent to discharge its obligations under the bond.[10]
Although no Florida post-U.C.C. court decisions are on point, it has been generally assumed that Florida's law is consistent with its prior law and the law in our sister states.[11] In view of the strong admonition in the U.C.C. to interpret the code in a uniform manner,[12] it would require a well entrenched bit of pre-Code Florida law to prevail over such a storm of interstate authority to the contrary. Since, as discussed above, equitable subrogation prevailed in Florida prior to adoption of the Uniform Commercial Code, one can only conclude it continues to do so.[13]
Transamerica's right of equitable subrogation in this case should enable it to prevail over Barnett, to the extent it has suffered a loss through payment or performance of a contract, pursuant to its bond on that project. In its brief, Transamerica urges that we recognize its right of set-off, pertaining to possible excess construction funds on other jobs. Since the record does not disclose the identity or context of the additional rights Transamerica may claim on other contracts, we can make no determination concerning such rights. However, to the extent Transamerica is claiming proceeds on construction contracts not covered by its bond based on the "dragnet" collateral provisions in its indemnity agreement with Turner, or earned but unpaid construction funds held by an owner which exceed the surety's loss on a particular job, it appears that Transamerica has left the safe haven of equitable subrogation for the posture of a contract assignee, or "conventional subrogation," and must jump the hurdles of having to perfect such a security interest under the Code.[14] The opinion in this case therefore must be strictly confined to Transamerica's rights of equitable subrogation to recover from each owner (out of earned but unpaid construction funds) its losses under the bond issued for the particular contract.[15]
Finally, Barnett argues that we are bound by our decision in Waterhouse v. McDevitt & Street Co., 387 So.2d 470 (Fla. 5th DCA 1980), which is apparently the only opinion in the United States to say that a right of subrogation is a contract *451 right controlled by the U.C.C. The facts in Waterhouse were complicated, but it is clear that a surety's right to equitable subrogation was not involved in that case. We said:
We question whether the doctrine of equitable subrogation ever came into play. This case does not involve the surety's obligation to perform upon default of its principal and its concomitant right to subrogation. Rather, the right to reimbursement was based solely on Fidelity's contract agreement with Martin. (Emphasis in original).
* * * * * *
... No equitable subrogation was involved because the principal was not in default. The only claim which Fidelity had was its right by contract to reimbursement for payments made in a good faith belief they were necessary or expedient. (Emphasis in original).
Waterhouse, 387 So.2d at 472.
In Waterhouse the perfected secured creditor prevailed because it was a case involving competing contract assignees or "conventional subrogation." In this case, the principal was in default, the surety performed pursuant to its bond, and it earned its equitable subrogation rights to the extent of its losses. This is a typical equitable subrogation case in which the surety generally prevails over the contract assignee, without regard to perfection under the U.C.C.
I am unpersuaded by Barnett's public policy argument that banks and financers, who lend money on the security of assigned construction contract proceeds, need the protection of requiring sureties to file for perfection under the U.C.C., so they can ascertain the existence of such claimants. The practice of private owners requiring bonds on sizeable construction projects is well known. Further, anyone lending on government projects, as in this case, must know bonds are required by state and federal law.[16] The existence of a surety on most large construction contracts should be assumed by lenders like Barnett.
Requiring sureties to file financing statements would not therefore actually solve a notice problem. It would, however, rearrange the parties' priorities, since most sureties do not perfect their rights under the Code. The consternation and disarray caused by such a change in the law and business practice would serve no useful purpose. I conclude that any such change should be wrought by the Legislature, after due public notice and discussion, and not by an intermediate court of appeal.
I would reverse.
NOTES
[1] We are grateful for the excellent briefs and oral arguments the parties provided the court in this case.
[2] The combination agreement for indemnity and assignment in this case provides:

UNIFORM COMMERCIAL CODE
FIFTH: That this Agreement shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity.
[3] In this particular case the contractor entered into an indemnity and assignment agreement in 1979 as to future bonds and future contracts. The bonds in this case were executed in 1983 and 1984.
[4] The bank's assignment is unquestionably covered by the U.C.C.; as to amounts already earned, it is an assignment of "accounts"; as to amounts to be earned under an existing contract, it is an assignment of "contract rights"; as to amounts that may be earned under future contracts, it is an assignment of "general intangibles."
[5] The following sources have been of great assistance in the consideration of this area: II G. Gilmore, Security Interest in Personal Property § 36.1-36.8 (1965); Jacobs v. Northeastern: Surety's Dilemma  Subrogation Rights or Perfected Security Interest, 69 Dick.L.Rev. 172 (1965); National Shawmut Bank: Another Step Toward Confusion in Surety Law, 64 Nw.U.L. Rev. 582 (1965); Suretyship: Subrogation Under the Uniform Commercial Code, 65 Colum.L. Rev. 927 (1965).
[6] The Miller Act, 49 Stat. 794 (1935), 40 U.S.C. § 270a-d (1958) amended 73 Stat. 279 (1959), 40 U.S.C. § 270a-d (Supp. IV 1959-1962) (current version at 40 U.S.C. § 270a-d (1982) and the predecessor Heard Act, 28 Stat. 278 (1894), as amended 33 Stat. 811 (1905). The state counterpart in Florida is section 255.05, Florida Statutes.
[7] Martin v. National Surety Co., 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822 (1937); Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896).
[8] 54 Stat. 1029 (1940), as amended 31 U.S.C. § 203, 41 U.S.C. § 15 (1950).
[9] E.g., Pearlman v. Reliance Insurance Co., 371 U.S. 132, 136, 83 S.Ct. 232, 235, 9 L.Ed.2d 190, 193 (1962); McKenzie v. Irving Trust Co., 323 U.S. 365, 65 S.Ct. 405, 89 L.Ed. 305 (1945); In re J.V. Gleason Co., 452 F.2d 1219 (8th Cir.1971); National Shawmut Bank of Boston v. New Amsterdam Casualty Co., 411 F.2d 843 (1st Cir.1969); McAtee v. United States Fidelity and Guaranty Co., 401 F. Supp. 11 (N.D.Fla. 1975).
[10] United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); Phoenix Indemnity Co. v. Earle, 218 F.2d 645 (9th Cir.1955).
[11] Newark Insurance Co. v. United States, 181 F. Supp. 246 (Ct.Cl. 1960); Maryland Casualty Co. v. United States, 141 F. Supp. 900 (Ct.Cl. 1956); National Surety Corp. v. United States, 133 F. Supp. 381 (Ct.Cl. 1955); Hadden v. United States, 132 F. Supp. 202 (Ct.Cl. 1955); Royal Indemnity Co. v. United States, 93 F. Supp. 891 (Ct.Cl. 1950).
[12] See, e.g., General Casualty Co. of America v. Second National Bank of Houston, 178 F.2d 679 (5th Cir.1949); Coconut Grove Exchange Bank v. New Amsterdam Casualty Co., 149 F.2d 73, 78 (5th Cir.1945); Town of River Junction v. Maryland Casualty Co. 133 F.2d 57 (5th Cir.1943).
[13] At one time, while the U.C.C. was being written, there was a specific proposal in § 9-312(7) to flatly provide that a surety's security interest was always subordinate to a later interest given to enable the contractor to perform. This proposal was deleted, and the surety argues that the deletion indicates an affirmative intent that the surety's subrogation rights should prevail over a financing bank. We hold that the deletion of the proposed special priority rule merely put the problem back into the general priority rule, U.C.C. § 9-312(5) (§ 679.312(5), Fla. Stat.).
[14] See, e.g., the land record recording statute, section 695.01(1), Florida Statutes.
[15] A "good faith" limitation would mean that the "first-to-file" or "first-to-perfect" rule contained in the U.C.C. § 9-312(5) (§ 679.312(5), Fla. Stat.) would have been written to run only in favor of a secured party who acted in "good faith," i.e., without actual knowledge of earlier unperfected interests, at the time his interest attached or was perfected.
[16] See the short summary of the development and purpose of causes of action, including equitable subrogation, in the separate opinion in In Re Estate of Mundell, 459 So.2d 358, 361, 363 (Fla. 5th DCA 1984), rev. denied, Cowan v. Sanders, 467 So.2d 999 (Fla. 1985).
[17] The contractor's assignment to the surety is not only a security device but in effect is a conventional or contractual subrogation agreement in that it subrogates the surety who performs after the contractor's default to the contractor's right to recover from the owner. This is illustrated by the case of Balboa Insurance Company v. W.C.B. Associates, Inc., 390 So.2d 172 (Fla. 5th DCA 1980), which in effect holds that a surety's complaint stated a cause of action against an owner on the contractor's assignment and indemnity agreement.
[18] The provision in the appellant surety company's assignment, see note 2 above, that its security assignment constitutes a security agreement and a financing statement under the U.C.C. but does not in any way limit the surety's rights in equity, is a good drafting effort to "have one's cake and eat it too." However, the result is at odds with the original purpose of equitable subrogation, which is to provide a remedy to one who otherwise has no remedy. The surety's attempt to acquire a contractual subrogation right and still to retain its equitable remedy is not binding on courts when the very essence of the existence of that contract right with its legal remedy eliminates the need for an extraordinary equitable remedy.
[19] We expressly have not considered the possible subrogation rights of a payment bond surety as to category three funds or the priority of such rights as against other claimants thereto or the right of the bank as a judgment creditor, etc.
[20] The financing bank, the surety company, and the contractor were involved in numerous construction projects when the contractor allegedly defaulted in performing these projects.
[21] As noted supra, category (2) funds are those earned by the contractor by performance and payment of labor and materials before default, and actually due and payable to the contractor by the owner, but not paid over to the contractor or bank and still held by the owner.
[1] § 255.05 Fla. Stat. (1983).
[2] Ch. 65-254, Laws of Fla. (eff. Jan. 1, 1967).
[3] See 7 Fla.Jur.2d Bonds § 27 (1978).
[4] Commercial Bank in Panama City v. Board of Pub. Instruction of Okaloosa County, 55 So.2d 552 (Fla. 1951).
[5] Boley v. Daniel, 72 Fla. 121, 72 So. 644 (1916); Eastern Nat'l Bank v. Glendale Fed. Savings and Loan Assoc., 508 So.2d 1323 (Fla. 3rd DCA 1987); 73 Am.Jur.2d Subrogation § 2 (1974); 83 C.J.S. Subrogation § 1 at 576-77 (1953).
[6] See National Shawmut Bank of Boston v. New Amsterdam Cas. Co., 411 F.2d 843 (1st Cir.1969); U.S. Fidelity & Guar. Co. v. First State Bank of Salina, 208 Kan. 738, 494 P.2d 1149 (1972); Finance Co. of America v. U.S. Fidelity and Guar. Co., 277 Md. 177, 353 A.2d 249 (1976); Balboa Ins. Co. v. W.C.B. Assoc., Inc., 390 So.2d 172 (Fla. 5th DCA 1980); 17 Am.Jur.2d Contractor Bonds § 42 (1964).
[7] II G. Gilmore, Security Interest in Personal Property § 36.1-36.8 (1965); Nat'l Shawmut Bank: Another Step Toward Confusion in Surety Law, 64 NW.U.L.Rev. 582 (1969); Suretyship: Subrogation Under the Uniform Commercial Code, 65 Colum.L.Rev. 927 (1965).
[8] Gilmore, Security Interests in Personal Property, § 36.7 at 973 (1965).
[9] See, e.g., Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co., 411 F.2d 843 (1st Cir.1969); In re J.V. Gleason Co., 452 F.2d 1219 (8th Cir.1971); Home Indem. Co. v. United States, 193 Ct.Cl. 266, 433 F.2d 764 (1970); First Alabama Bank of Birmingham v. Hartford Accident & Indem. Co., Inc., 430 F. Supp. 907 (N.D. Ala. 1977); Third Nat'l Bank in Nashville v. Highlands Ins. Co., 603 S.W.2d 730 (Tenn. 1980); Alaska State Bank v. Gen. Ins. Co. of America, 579 P.2d 1362 (Alaska 1978); Argonaut Ins. Co. v. C & S Bank of Tifton, 140 Ga. App. 807, 232 S.E.2d 135 (1976); Fin. Co. of America v. U.S. Fidelity & Guar. Co., 277 Md. 177, 353 A.2d 249 (1976); Canter v. Schlager, 358 Mass. 789, 267 N.E.2d 492 (1971); U.S. Fidelity & Guar Co. v. First State Bank of Salina, 208 Kan. 738, 494 P.2d 1149 (1972); Travelers Indem. Co. v. Clark, 254 So.2d 741 (Miss. 1971); Jacobs v. Northeastern Corp., 416 Pa. 417, 206 A.2d 49 (1965); White and Summers, Uniform Commercial Code § 22-5 (2d ed. 1980).
[10] See Nat'l Surety Co. v. State Nat'l Bank of Frankfort, 454 S.W.2d 354 (Ky. 1970).
[11] See McAtee v. U.S. Fidelity & Guar. Co., 401 F. Supp. 11 (N.D.Fla. 1975); Williams, 1 Florida Law of Secured Transactions in Personal Property, § 1.02 at 53 (1980).
[12] U.C.C. 1-102(2)(c) (§ 671.102(2)(c), Fla. Stat. (1983)).
[13] See In re J.V. Gleason Co., 452 F.2d 1219 (8th Cir.1971); Alaska State Bank v. Gen. Ins. Co. of America, 579 P.2d 1362 (Alaska 1978); Finance Co. of America v. U.S. Fidelity & Guar. Co., 277 Md. 177, 353 A.2d 249 (1976); Canter v. Schlager, 358 Mass. 789, 267 N.E.2d 492 (1971).
[14] See Travelers Indem. Co. v. Clark, 254 So.2d 741 (Miss. 1971); Aetna Cas. & Surety Co. v. Brunken, 357 F. Supp. 290 (D.S.D. 1973); dicta, In re J.V. Gleason Co., 452 F.2d 1219, 1221 (8th Cir.1971).
[15] See Finance Co. of America v. U.S. Fidelity & Guar. Co., 277 Md. 177, 353 A.2d 249 (1976).
[16] See Canter v. Schlager, 358 Mass. 789, 267 N.E.2d 492 (1971); U.S. Fidelity & Guar. Co. v. First State Bank of Salina, 208 Kan. 738, 494 P.2d 1149 (1972).